# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

YAHYA FAROOQ MOHAMMAD, et al.,

    Defendants.

Case No. 3:15-cr-358
**CHIEF JUDGE EDMUND A. SARGUS, JR.**

## OPINION AND ORDER

Defendant Yahya Farooq Mohammad ("Farooq") has requested discovery regarding two terrorist incidents referenced in the Indictment and on the screening procedures utilized by Anwar al-Awlaki ("al-Awlaki"). For the following reasons, Farooq's Motion [ECF No. 133] is **GRANTED IN PART** and **DENIED IN PART**.

### I.

Farooq and his co-Defendants, Ibrahim Zubair Mohammad, Sultane Roome Salim, and Asif Ahmed Salim, were indicted on September 30, 2015, and charged with (Count 1) conspiracy to provide and conceal material support to terrorists, in violation of 18 U.S.C. § 2339A; (Count 2) providing material support to terrorists, in violation of 18 U.S.C. § 2339A; (Count 3) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (brought against Farooq and Ibrahim only); and (Count 4) conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k). (Indictment at 12–72 [ECF No. 1].)[1]

---

[1] Under 18 U.S.C. § 2339A,

    [w]hoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [an enumerated

The Government accuses Defendants of conspiring to provide, and actually providing, funds and other material support to al-Awlaki for the preparation and execution of terrorist attacks and killings. (*See* Indictment at 12, 68.) The Government contends that Defendants conspired to obstruct its investigation into their illicit fundraising by making false statements to the FBI and destroying or concealing records. (*Id.* at 65–67, 71–72.) And as to Farooq and Ibrahim, the Government additionally alleges that they conspired to raise money for al-Awlaki through various fraudulent credit card and PayPal transactions. (*Id.* at 68–71.)

On May 3, 2016, Farooq submitted a written discovery request to the Government. As relevant here, Farooq requested

i. the sources of funding and communications between U.S. Army Major Nidal Malik Hassan and other co-conspirators, aiders, or abetters, including specifically Anwar al-Awlaki, pertaining to the "Fort Hood Shooting" referenced in ¶ 21-22 of the Indictment;

ii. the sources of funding and communications between Umar Farook Abdulmutallab and other "terrorists," co-conspirators, aiders, or abetters including specifically Anwar al-Awlaki, pertaining to the "attempted destruction of Flight 253" referred to in ¶ 23-24 of the Indictment; this request specifically includes the names and identity of the "other terrorists" referred to in footnote 2 p.3, of the Government's Sentencing Memo in the Abulmutallab case, as well as the written or digital communications between Abdulmutallab referred to in pages 12-14 of the Supplemental Factual Appendix contained therein; and,

iii. any and all other requests made by Anwar al-Awlaki to other would be jihadis or terrorists to provide written reasons and other screening processes used by al-Awlaki for those wanting to participate in jihad such as was alleged to be done with Mr. Abulmutallab as set forth in the aforementioned Supplemental Factual Appendix.

(Farooq Disc. Ltr. at 4 [ECF No. 133-1].) On July 20, 2016, the Government offered the following response:

---

federal law, including 18 U.S.C. §§ 1114, 2332, and 2332b] or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be [punished].

18 U.S.C. § 2339A(a).

2

> i. <u>Sources of Funding and Communications Involving U.S. Army Major Nidal Malik Hassan</u>: To the extent that the defendant is requesting evidence that any of the co-defendants or co-conspirators funded or communicated with Hassan, the undersigned is not aware of any such evidence and the government does not intend to introduce at trial any evidence indicating or attempting to show that any of the co-defendants or co-conspirators communicated with Hassan or provided funding to him. To the extent that the defendant is requesting evidence of funding of Hassan by other sources or of communications between Hassan and others, including Anwar Al-Awlaki, the government objects to this request and declines to respond as it requests evidence that is outside the scope of the government's discovery obligations under Rule 16, <u>Brady</u>, or <u>Giglio</u>.
>
> ii. <u>Source of Funding and Communications Between Umar Farook Abdulmutallab and Other Terrorists</u>: The government objects to this request and declines to respond as it is not within the scope of its discovery obligations under Rule 16, Brady, or Giglio. The identities of other terrorists in Awlaki's camp are not relevant to the charges against the defendants in this case as the government is not aware of and does not intend to introduce at trial any evidence of any communications between these unidentified terrorists and the defendants in this case. Evidence of communications between Abdulmutallab and Awlaki, if such evidence exists, is also not relevant to the charges against the defendants as they would not be parties to such communications. Regarding funding for Abdulmutallab's attempted attack, the government will provide a further response prior to trial.
>
> iii. <u>Screening Processes Used by Awlaki</u>: The government objects to this request and declines to respond as it is not within the scope of its discovery obligations under Rule 16, <u>Brady</u>, or <u>Giglio</u>. Evidence of the means by which other, unidentified individuals met with Awlaki is not relevant to the charges against the defendants in this case. However, without conceding that this request is relevant, defense counsel is referred to the publicly filed sentencing memorandum and attachments in <u>United States v. Pham</u>, case number 1:12cr423, Southern District of New York for a description of the process by which another individual met Awlaki in Yemen.

(Gov't Resp. to Disc. Ltr. at 4 [ECF No. 133-2].)

Farooq filed his instant Motion [ECF No. 133] to compel discovery on August 24, 2016. He then filed a supporting memorandum [ECF No. 151] on September 30, 2016. Citing Federal Rule of Criminal Procedure 16(a)(1)(E)(i), *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and Ohio Rule of Professional Conduct 3.8(d), Farooq seeks an order compelling the Government to produce information from the categories described above regarding (i) the Fort Hood shooting,

3

(ii) the attempted destruction of Northwest Airlines Flight 253, and (iii) the screening procedures utilized by al-Awlaki. The Government opposes Farooq's request.

## II.

### A. Applicable Law

Federal Rule of Criminal Procedure 16 is the principal mechanism for discovery in federal criminal cases. Farooq brings his Motion under Rule 16(a)(1)(E)(i), which provides for the Government's disclosure of documents and objects:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) The item is material to preparing the defense . . . .

Fed. R. Crim. P. 16(a)(1)(E)(i).

To succeed on a motion under Rule 16(a)(1)(E)(i), the defendant must make a prima facie showing of the requested item's materiality. *United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011). The Sixth Circuit has not authoritatively defined materiality in the Rule 16 context. *Id.* The Supreme Court has, however, clarified that "defense" under Rule 16 refers to the "'defendant's response to the Government's case in chief.'" *Id.* (quoting *United States v. Armstrong*, 517 U.S. 456, 462 (1996)). Consequently, the Rule only applies to "'shield' claims that 'refute the Government's arguments that the defendant committed the crime charged'" *United States v. Robinson*, 503 F.3d 522, 532 (6th Cir. 2007) (quoting *Armstrong*, 517 U.S. at 462). Information is not material "'merely because the government may be able to use it to rebut a defense position.'" *Lykins*, 428 F. App'x at 624 (quoting *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)). "Rather, there must be an indication that pre-trial disclosure would have enabled the defendant to 'alter the quantum of proof in his favor,' not merely that a

4

defendant would have been dissuaded from proffering easily impeachable evidence." *Id.* (quoting *Stevens*, 985 F.2d at 1180). To assess materiality, the Court must "consider the logical relationship between the information withheld and the issues in the case, as well as the importance of the information in light of the evidence as a whole." *Id.*

Farooq also brings his Motion under *Brady*, which imposes "a general obligation upon the Government to disclose evidence that is favorable to the accused and material to guilt or punishment." *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988). This disclosure obligation applies to exculpatory evidence as well as evidence that a defendant could use to impeach a Government witness. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *Abdur'Rahman v. Colson*, 649 F.3d 468, 473 (6th Cir. 2011). The obligation also applies to evidence material to sentencing. *Jefferson v. United States*, 730 F.3d 537, 554 n.4 (6th Cir. 2013). Evidence is material under *Brady* if there is "'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio*, 405 U.S. at 154) (internal quotation marks omitted). That is, to prevail on a *Brady* claim, a defendant need not show that he, more likely than not, would have been acquitted had the new evidence been admitted. *Id.* Rather, a defendant "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict. *Id.* (quoting *Smith v. Cain*, 132 S. Ct. 627, 629–31 (2012)); *see Strickler v. Greene*, 527 U.S. 263, 290 (1999) ("[T]he materiality inquiry is not just a matter of determining whether . . . the remaining evidence is sufficient to support the jury's conclusions.").

"[T]he government typically is the sole judge of what evidence in its possession is subject to disclosure" under *Brady*. *Presser*, 844 F.2d at 1281. The Government "acts at its own peril" if it fails to comply adequately with a discovery order requiring it to disclose *Brady* material. *Id.*

5

However, if the Government fails to disclose *Brady* material, the defendant has a constitutional remedy for the nondisclosure only after the trial has concluded. *United States v. Short*, 671 F.2d 178, 187 (6th Cir. 1982) ("This is not to say that a *Brady* violation may not occur when the prosecution fails to disclose exculpatory material in response to a pretrial motion. The violation may take place at any time, but *Brady* may be invoked only when the trial has been completed. While the problem exists for a prosecutor before and during a trial, it becomes a concern of the court after the trial has ended." (italics added).) *Brady*, in other words, "is not a discovery device," nor does it confer pretrial rights or remedies. *United States v. Jones*, 678 F. Supp. 1302, 1303 (S.D. Ohio 1988) (citing *Short*, 671 F.2d at 187). As the Supreme Court has reiterated, "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

Lastly, Farooq brings his Motion under Ohio Rule of Professional Conduct 3.8(d). Under that Rule, which applies to Government attorneys under 28 U.S.C. § 530B(a), a prosecutor in a criminal case shall not

> fail to make timely disclosure to the defense of all evidence or information *known* to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, fail to disclose to the defense all unprivileged mitigating information *known* to the prosecutor, except when the prosecutor is relieved of this responsibility by an order of the *tribunal*.

Prof. Cond. Rule 3.8(d) (emphasis in original).

The Court turns now to Farooq's discovery requests.

**B.     The Fort Hood Shooting**

In its Indictment, the Government briefly describes the Foot Hood shooting and al-Awlaki's subsequent blog post praising the attack:

6

> On or about November 5, 2009, U.S. Army Major Nidal Malik Hasan killed thirteen (13) and wounded thirty (30) U.S. military members preparing for deployment to Afghanistan at Fort Hood, Texas.
>
> On or about November 9, 2009, Awlaki posted an entry entitled "Nidal Hassan Did the Right Thing" to his website. In the blog entry, Awlaki stated, "Nidal Hassan is a hero. He is a man of conscience who could not bear living the contradiction of being a Muslim and serving in an army that is fighting against his own people. . . . The U.S. is leading the war against terrorism which in reality is a war against Islam. Its army is directly invading two Muslim countries and indirectly occupying the rest through its stooges. Nidal opened fire on soldiers who were on their way to be deployed to Iraq and Afghanistan. How can there be any dispute about the virtue of what he has done? In fact the only way a Muslim could Islamically justify serving as a soldier in the US army is if his intention is to follow the footsteps of men like Nidal. . . . The fact that fighting against the US army is an Islamic duty today cannot be disputed. No scholar with a grain of Islamic knowledge can defy the clear cut proofs that Muslims today have the right—rather the duty—to fight against American tyranny. Nidal has killed soldiers who were about to be deployed to Iraq and Afghanistan in order to kill Muslims. The American Muslims who condemned his actions have committed treason against the Muslim Ummah and have fallen into hypocrisy. . . . May Allah grant our brother Nidal patience, perseverance and steadfastness and we ask Allah to accept from him his great heroic act."

(Indictment ¶¶ 21–22 [ECF No. 1] (paragraph numbers omitted).) Based on the inclusion of these allegations in the Indictment, Farooq has requested from the Government (i) information on the sources of funding for the Fort Hood shooting and (ii) communications between Hasan and other co-conspirators, aiders, or abetters of the attack, including al-Awlaki. (Farooq Mem. in Supp. at 16 [ECF No. 151].) Farooq argues that this information must be disclosed because it would reveal that al-Awlaki—and, thus, Defendants—neither funded nor assisted in planning the shooting. (*Id.* at 17–18.) That al-Awlaki did not fund Hasan would purportedly undermine the Government's assertion that Defendants knew, or intended, that their contribution to al-Awlaki in July 2009 would fund terrorist attacks. (*Id.*) Farooq contends that the requested information must also be disclosed for sentencing purposes. (*Id.* at 18–19.) The information could allegedly refute a Government argument at sentencing that the Fort Hood shooting was a reasonably

7

foreseeable consequence of providing funds to al-Awlaki. (*Id.* at 19 (citing U.S.S.G. § 1B1.3(a)(1)(A)–(B)).)

The Government has responded by noting that Farooq already has access to the communications he seeks. (Gov't Resp. at 9–10 [ECF No. 166].) Those communications, between Hasan and al-Awlaki, are included in a report that Farooq discusses in his supporting memorandum: the *Final Report of the William H. Webster Commission on the Federal Bureau of Investigation, Counterterrorism Intelligence, and the Events at Fort Hood, Texas, on November 5, 2009* (the "Webster Report"). (*Id.*)

Because Farooq already has access to Hasan's communications via the Webster Report, and because the Government is under no obligation to provide a defendant with what he already possesses or can reasonably obtain from other sources, *see Abdur'Rahman*, 649 F.3d at 474; *United States v. Neumann*, No. 3:07 CR 620, 2008 WL 1944815, at *1 (N.D. Ohio May 1, 2008), Farooq's request for discovery of Hasan's communications is denied as moot.

As to the Hasan's sources of funding, the Government avers that it has never claimed that Hasan received funding from Defendants or al-Awlaki. (Gov't Resp. at 10.) The Government argues that the information is immaterial because Defendants' identification of an alternative funding source of the attack would not undermine a claim the Government intends to make in its case-in-chief. (*See id.*) From the Government's perspective, the relevance of the Fort Hood shooting is (a) al-Awlaki's public profession of support for Hasan following the attack and (b) the reaction of one of Farooq's co-Defendants to al-Awlaki's public statement. (*Id.*) These statements about the shooting purportedly constitute circumstantial evidence of Defendants' intent to fund terrorist attacks through the alleged payments to al-Awlaki. (*See id.*)

8

The Court takes the Government at its word that it will only discuss the Fort Hood shooting in its case-in-chief to highlight the post-event statements made by al-Awlaki and one of the co-Defendants. But focusing only on these explicit arguments ignores the questions that may arise in jurors' minds when they hear about the shooting during a trial in which Farooq is accused of, among other things, providing material support to terrorists. It is almost inescapable that jurors would infer from the discussion that Farooq's alleged material support somehow funded the shooting. To shield himself from this inference, Farooq could present evidence of the true source of Hasan's funding. Or, alternatively, the parties could enter into a stipulation that Hasan's funding did not come from Defendants or al-Awlaki. Evidence of Hasan's funding sources, or an appropriate stipulation, would also help Farooq rebut an assertion at sentencing that the relevant conduct in the case includes the shooting. Because this evidence could alter the quantum of proof in the case or affect a jury's judgment, the evidence must be disclosed under Rule 16(a)(1)(E)(i) and *Brady* absent the parties entering into a stipulation.

### C. The Attempted Destruction of Flight 253

Farooq's discovery request regarding the attempted destruction of Northwest Airlines Flight 253, like his request regarding the Fort Hood shooting, stems from language in the Indictment. The Indictment includes a brief description of the attempted bombing and al-Awlaki's public response:

> On or about December 25, 2009, Umar Farouk Abdulmutallab attempted to destroy an aircraft, specifically Northwest Airlines Flight 253, above Detroit, Michigan.
>
> On or about February 7, 2010, Awlaki was interviewed by a news media outlet regarding Umar Farouk Abdulmutallab. In this interview, Awlaki stated, "I support what Umar Farouk [Abdulmutallab] has done after I have been seeing my brothers being killed in Palestine for more than 60 years, and others being killed in Iraq and in Afghanistan. And in my tribe too, US missiles have killed 17 women and 23 children, so do not ask me if al-Qaeda has killed or blown up a US

9

> civil jet after all this. The 300 Americans are nothing compared to the thousands of Muslims who have been killed. . . . It would have been better if the plane was a military one or if it was a US military target. Al-Qaeda organization has its options, and the American people live [in] a democratic system and that is why they are held responsible for their policies. . . . I want to draw these scholars' attention to the fact that there are US officers, whether intelligence or army officers, now in Sanaa and other areas, and this is US intervention. Why do not these scholars issue fatwas to kill these officers? They are spying, killing and training Yemeni soldiers to kill."

(Indictment ¶¶ 23–24 [ECF No. 1] (paragraph numbers omitted).) To refute the implication that Defendants' alleged payments to al-Awlaki funded the bombing attempt, Farooq requests from the Government (i) information on the sources of funding for Abdulmutallab's mission and (ii) communications between Abdulmutallab and his co-conspirators, including al-Awlaki. (*See* Farooq Mem. in Supp. at 13–16 [ECF No. 151].)

As to Abdulmutallab's funding sources, the Government represents that it has provided Farooq with all of the information in its possession. Farooq's request for the information is, accordingly, denied as moot.

Regarding the communications between Abdulmutallab and his co-conspirators, the Government asserts that any communications that may be in its possession are immaterial under Rule 16 and *Brady*. (Gov't Resp. at 8 [ECF No. 166].) The Government represents that it will not argue at trial that Defendants had any advanced knowledge of, or involvement in, Abdulmutallab's mission; consequently, the communications sought by Farooq would not rebut a claim made in the Government's case-in-chief. (*Id.*) The Government will reference Abdulmutallab's mission in its case-in-chief to make the argument that the money purportedly given to al-Awlaki by Defendants in July 2009 formed part of a "pool of funds" that al-Awlaki used for training operatives such as Abdulmutallab. (*Id.* at 9.)

10

Farooq requests all of the communications between Abdulmutallab and his co-conspirators, including al-Awlaki. (Farooq Mem. in Supp. at 15.) However, not all of the communications between Abdulmutallab and his co-conspirators are material under Rule 16(a)(1)(E)(i) or *Brady*. Given the Government's intention to discuss the Abdulmutallab bombing attempt only to make its pool of funds argument, the only communications that might alter the quantum of proof in the case or be reasonably likely to affect a jury verdict are communications about the funding of Abdulmutallab's mission. These are also the only communications that might be material to sentencing. The communications could suggest that Defendants' alleged payments did not make their way, via al-Awlaki, to Abdulmutallab.

Through a reference in its Response to "the fungibility of money," the Government seems to imply that the only communications that are material to this case are those (assuming they exist) suggesting that al-Awlaki did not contribute any funds toward Abdulmutallab's mission. (*See* Gov't Resp. at 9.) As the argument goes, because money is fungible, *any* money given by al-Awlaki toward Abdulmutallab's mission could be traced to Defendants' payments. (*See id.*) The unstated extension of the argument is that Defendants cannot undermine the pool of funds theory by asserting that al-Awlaki partitioned his funds or, in other words, by arguing that al-Awlaki used Defendants' alleged payments for benign purposes and used separate funds for illicit activities. For purposes of the present discovery Motion, the Court rejects this implication. The jury could reasonably reject the Government's theory that, due to the fungibility of money, any resources provided to al-Awlaki made their way to a single pool of funds. The jury could, instead, credit a defense theory proposing that al-Awlaki was engaged in both benign and illicit activities and that he strictly partitioned his funds along those lines. Farooq could, thus, undermine the Government's pool of funds theory through evidence of how al-Awlaki's funds

11

were maintained and spent. And Farooq might acquire this evidence through communications about the funding of Abdulmutallab's mission.

Farooq's request is denied to the extent that he seeks all of the communications between Abdulmutallab and his co-conspirators in the bombing attempt. Farooq is entitled, however, to communications about the funding of Abdulmutallab's mission.

D. **The Screening Procedures Used by al-Awlaki**

For his last request, Farooq asks the Government to produce information on the "screening procedures used by al-Awlaki for other would-be jihadis or terrorists wanting to participate in jihad." (Farooq Mem. in Supp. at 7 [ECF No. 151].) This information is purportedly relevant to Defendants' intent. (*See id.*)

Farooq contends that al-Awlaki screened individuals whose visits had an illicit purpose, such as participating in or funding terrorist attacks. (*See* Farooq Mem. in Supp. at 7.) Farooq explains, for example, that al-Awlaki utilized a screening procedure to vet the would-be suicide bomber, Abdulmutallab. (*Id.* at 7–8.) Abdulmutallab and al-Awlaki first corresponded by phone. (*Id.* at 8.) During the call, al-Awlaki instructed Abdulmutallab to write an essay explaining why he wished to become involved in jihad and why he wanted al-Awlaki's guidance. (*Id.*) Abdulmutallab spent several days working on the essay; al-Awlaki apparently found it acceptable, and the two met in the summer or fall of 2009. (*Id.*)

Farooq contrasts Abdulmutallab's experience with his own. When Farooq and the unindicted co-conspirators traveled to Yemen in July 2009, they intended to meet with al-Awlaki in person—without first writing an essay or engaging in any other screening procedure—and give him the $22,000 they had raised. (*See* Farooq Mem. in Supp. at 9.) Because Yemeni

12

government soldiers were present in the area, though, al-Awlaki instructed Farooq and the unindicted co-conspirators to meet with one of his associates. (*Id.*)

From Farooq's perspective, the fact that al-Awlaki did not subject him and the unindicted co-conspirators to a screening procedure before agreeing to meet with them constitutes circumstantial evidence that he did not intend to support terrorist attacks with the alleged payments. (*See* Farooq Mem. in Supp. at 7, 9–10.) Farooq contends that he contributed to al-Awlaki with the intent of supporting legitimate charitable efforts or for other First Amendment-protected reasons. (*See id.* at 7.) That al-Awlaki did not screen Farooq and his companions purportedly undermines Farooq's criminal intent for two reasons: "First, an individual's participation in screening procedures demonstrates their knowledge and intent. Second, the fact that al-Awlaki imposed screening procedures on an individual would indicate the nefariousness of the exchange—giving that individual reason to know that al-Awlaki may have intended to use the money for some improper, criminal purpose." (*Id.* at 10.) To effectively advance this argument, Farooq requests information about the screening procedures al-Awlaki may have used to vet would-be operatives or would-be terrorist financiers other than Abdulmutallab. (*See id.* at 12.)

The Government asserts that the requested information about al-Awlaki's screening procedures is immaterial. (Gov't Resp. at 6 [ECF No. 166].) Because the procedures were not used in this case but, rather, with different individuals and under distinct circumstances, the Government argues that the procedures shed light on the intent of the other would-be operatives, not on Defendants' intent. (*See id.* at 6–7.) The Government further argues that Farooq already has knowledge of screening procedures used by al-Awlaki for would-be operatives—the procedures used to vet Abdulmutallab. (*Id.* at 7.)

13

The Court agrees that the requested information is not material. Farooq can compare al-Awlaki's screening procedures for him and the unindicted co-conspirators with al-Awlaki's screening procedures for would-be operatives using the information he already has. Farooq knows the screening procedures that al-Awlaki used with Abdulmutallab—a terrorist operative and would-be suicide bomber. (*See* Farooq Mem. in Supp. at 8.) And Farooq knows the screening procedures (or lack thereof) that al-Awlaki used with him. (*See id.* at 9.) Armed with this information, Farooq can assert the defense that he outlines in his Memorandum—that his lack of participation in screening procedures suggests that he had no knowledge or intent that his alleged payment would finance terrorist-related activities. (*See id.* at 10.) Because it is not material to preparing the defense that Farooq intends to mount, (*see id.* at 10, 12), information about al-Awlaki's screening procedures for other would-be operatives need not be disclosed under Rule 16(a)(1)(E)(i).

Information about al-Awlaki's screening procedures is not material under *Brady* either. The information Farooq seeks is not directly exculpatory. *See United States v. Mullins*, 22 F.3d 1365, 1372 (6th Cir. 1994) (indicating that *Brady* requires disclosure of evidence "which is directly exculpatory of the defendant"). That is, the screening procedures al-Awlaki used for other individuals would not have a reasonable likelihood of affecting the jury's judgment regarding *Farooq's* intent in providing funds to al-Awlaki. Further, informing the jury of the screening procedures al-Awlaki used for other individuals would not have a reasonable likelihood of affecting the jury's judgment given that Farooq already has the information he needs (i.e., al-Awlaki's screening procedures for Abdulmutallab) to contrast his experience with a would-be operative's experience. *See Brooks v. Tennessee*, 626 F.3d 878, 893 (6th Cir. 2010) ("Evidence that is 'merely cumulative' to evidence presented at trial is 'not material for purposes

14

of *Brady* analysis.'" (quoting *Carter v. Mitchell*, 443 F.3d 517, 533 n.7 (6th Cir. 2006))). And as to sentencing, the screening procedures that al-Awlaki used for individuals other than Farooq and the unindicted co-conspirators would not constitute relevant conduct and, consequently, would have no reasonable likelihood of affecting Farooq's sentencing.

The information that Farooq seeks also fails to trigger the disclosure requirement found in Ohio Rule of Professional Conduct 3.8(d). For the reasons discussed above, the requested information does not tend to negate Farooq's guilt, nor would the information mitigate Farooq's sentence. *See* Prof. Cond. Rule 3.8(d).

### III.

For these reasons, Farooq's Motion [ECF No. 133] to compel discovery is **GRANTED IN PART** and **DENIED IN PART**. The Government shall disclose to Farooq (i) information on the sources of funding for the Fort Hood shooting and (ii) communications about the funding of Abdulmutallab's attempted destruction of Northwest Airlines Flight 253. Farooq's other disclosure requests are denied.

**IT IS SO ORDERED.**

6-6-2017
DATE

EDMUND A. SARGUS, JR.
CHIEF UNITED STATES DISTRICT JUDGE