IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NOs.: 3:15CR358-001 |
| | )                3:16CR222 |
| Plaintiff, | ) |
| | ) JUDGE EDMUND A. SARGUS, JR. |
| | ) |
| v. | ) |
| | ) |
| YAHYA FAROOQ MOHAMMAD, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Now comes the United States of America, by and through its counsel, Justin E. Herdman, United States Attorney, Northern District of Ohio; Daniel L. Lemisch, Acting United States Attorney, Eastern District of Michigan; Matthew W. Shepherd and Michael J. Freeman, Assistant United States Attorneys; and Gregory R. Gonzalez, Trial Attorney, U.S. Department of Justice, Washington, D.C., respectfully moves this Court to accept the proposed plea agreement and sentence the Defendant to a total term of 330 months of imprisonment (180 months on Count 1 in case 3:15CR358 and 240 months on Count 2 in case 3:16CR222 with 90 months to be served concurrently), and order the Defendant's removal from the United States.

**I.      Introduction**

Defendant Yahya Farooq Mohammad conspired to provide significant funds to a terrorist dedicated to attacking the United States. When finally brought to justice for his support for terrorism, the Defendant's dedication to his cause did not stop. While in custody awaiting trial, he solicited the murder of a federal judge. As punishment for these offenses, a significant prison sentence is necessary. After taking into account the Advisory Sentencing Guidelines and all of the

factors at 18 U.S.C. §3553(a), the sentence agreed to by the parties of 330 total months (27.5 years) in prison is appropriate for the Defendant, along with an order that he be removed from the United States upon completion of his sentence. For the reasons below, the government requests that the Court approve the 11(c)(1)(C) plea agreement entered into by the parties.

## II. Procedural History

On September 30, 2015, the Defendant was indicted in case number 3:15CR358 a four-count Indictment and charged with Conspiracy to Provide and Conceal Material Support to Terrorists in violation of 18 U.S.C. § 2339A (Count 1); Providing Material Support to Terrorists in violation of 18 U.S.C. § 2339A (Count 2); Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. § 1349 (Count 3); and Conspiracy to Obstruct Justice in violation of 18 U.S.C. § 1512(k) (Count 4). The charges resulted primarily from the Defendant's efforts to provide funds to Anwar al-Awlaki. After being deported from the United Arab Emirates where he was residing, the Defendant was arrested when he arrived in the United States in November 2015. The Defendant was detained pending trial. While detained, the Defendant solicited the murder of the judge presiding over his pending criminal case, Judge Jack Zouhary, attempting to arrange the murder by a "hit man" contacted by a fellow detainee. Defendant was then indicted in case number 3:16CR222 for this conduct in July 2016 and charged with Attempted Murder of a Federal Official in violation of 18 U.S.C. §1114(3) (Count 1); Solicitation of a Crime of Violence in violation of 18 U.S.C. § 373(a) (Count 2); and Use of Facility of Interstate Commerce in Murder-for-Hire in violation of 18 U.S.C. § 1958(a) (Count 3).

After extensive litigation and negotiations, the parties agreed on the terms of a binding plea agreement pursuant to Rule 11(c)(1)(C). As part of that agreement, the Defendant agreed to plead guilty to Conspiracy to Provide and Conceal Material Support to Terrorists as charged in Count 1

of case 3:15CR358 and to Solicitation to Commit a Crime of Violence as charged in Count 2 of case 3:16CR222.  The government agreed to dismiss the remaining counts charged in both cases at sentencing.  The parties agreed that Defendant would be sentenced to 180 months imprisonment for Count 1 in case 3:15CR358, and to 240 months imprisonment for Count 2 in case 3:16CR222, with 90 months to be served concurrently and the rest consecutively, resulting in a total sentence of 330 months (27.5 years).  As part of the agreement, the Defendant also agreed to the entry of a judicial order of removal from the United States.  The Defendant pled guilty according to these terms on July 10, 2017.

### III.     Advisory Sentencing Guidelines

The advisory sentencing guideline computation contained in the final presentence report is correctly calculated and is consistent with the ultimate range in the proposed plea agreement.  In sum, the total offense level is 43, a criminal history category VI, which corresponds to a Life recommendation. (PSR, Dkt. No. 272, ¶¶ 65, 71, 102.)  However, the statutory maximums for the offenses of conviction limit the sentence to 420 months (35 years), which would require that the Court "stack" the sentences, or run them consecutively to each other (a maximum sentence of 180 months on Count 1 in case number 3:15CR358 plus a maximum of 240 months on Count 2 in case number 3:16CR222). (*Id*. ¶ 102.)  Neither party objected to this determination.  (*Id*. Addendum.). The plea agreement entered by the parties would thus result in a sentence less than that contemplated by the advisory guidelines range.  However, based on the consideration of the 18 U.S.C. § 3553(a) factors and the facts and circumstances of this case, the government believes that the sentence of 27.5 years contained in the plea agreement is appropriate.

## IV. Factors Under 18 U.S.C. § 3553(a)

In addition to the advisory guideline recommendation, Congress has required courts to consider the factors identified in Title 18, United States Code, Section 3553(a), including: the nature and circumstances of the offense; the history and characteristics of the defendant; to afford adequate deterrence (both personal and general); to protect the public; and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and to provide a just punishment, when determining the appropriate sentence.

### A. Nature and Circumstances of the Offenses

The PSR contains a detailed description of the Defendant's criminal conduct. (*Id.* ¶¶ 14-40). The Defendant's criminal conduct spans several years and is the manifestation of his personal evolution to support violent jihad against the West. He first started by reading and discussing violent jihadi propaganda. He then elevated his conduct to financially supporting this violent jihadist mission. And finally, he actively planned and facilitated a crime of violence targeting a federal judge.

His evolution began in at least 2005 when he and a small group of like-minded individuals, including his co-defendants, began reading, disseminating, and discussing material about the "war on Islam" from the West and the need to support offensive jihad. (*Id*. ¶ 15.) Their primary source of this information was the speeches and writings of Anwar al-Awlaki. (*Id*.) Awlaki's rhetoric changed over time, but at a minimum, he left no doubt as to his mission to engage in "violent jihad" in the speech, "Constants on the Path of Jihad." (*Id.* ¶ 15, n.1; Indictment 3:15CR358-001, Dkt. 1, ¶ 47.) The Defendant and his group shared the transcript of this speech in May 2007. (Indictment ¶ 47.) In that speech, Awlaki openly and explicitly called for Muslims to take part in violent jihad. (*Id.*).

On January 5, 2009, Awlaki disseminated on his website an article titled, "44 Ways to Support Jihad." (Indictment ¶ 12.) The next day, the Defendant shared a link of this article with his brother and others. (*Id.* ¶ 93.) "44 Ways to Support to Jihad" was a call to arms for Awlaki's followers, calling on them to engage in a form of total war in support of violent jihad against the West or others he felt were oppressing Muslims. Awlaki instructed his followers to support violent jihad in every possible way, using the resources available to his followers. Those who could physically fight were to fight, while those who were not in a position to fight were to support those fighting in every possible way, such as providing financial support, providing prayers, having the right intentions, supporting the families of those fighting, fundraising, contributing to medical needs, providing moral support and encouragement, supporting the families of prisoners, fighting the lies of Western media, spreading the news of jihad, using the Internet in support of jihad, being physically fit, undergoing first aid training, and undergoing arms training, among others. Specifically relevant to the Defendant's conduct, Awlaki instructed that the third way to support jihad is to "Jihad with your wealth" because "probably the most important contribution the Muslims of the West could do for Jihad is making Jihad with their wealth . . . [because] men are in need of Jihad and Jihad is in need of money." (*Id.* ¶ 12(c).) The Defendant sought to put Awlaki's words into action by raising money for Awlaki to support Awlaki's efforts to engage in terrorist actions.

The Defendant and his co-conspirators did not simply raise money for jihad from legal sources of income, but instead raised a portion of the money from defrauding United States banks, a decision the Defendant mulled over and gave tremendous thought. (PSR ¶ 16; Indictment ¶¶ 48-52, 69, 88, 121-123, 208-209, 211, and 251.) The Defendant opened lines of credit, incurred debt with no intention of paying it back, and used that money to donate to Awlaki. (*Id.*)

The Defendant's evolution continued when he travelled to Yemen on July 23 through July 26, 2009.  (PSR ¶ 19).  He and his two associates brought approximately $22,000 in cash to provide to Awlaki.  (*Id*.)   Their attempt to meet Awlaki was thwarted by the presence of the Yemeni military, but the money was provided to an Awlaki associate.  (*Id*.)  Awlaki sent an email to the Defendant in acknowledgement of the money and gratitude for their contribution.  (*Id*. ¶ 20.)

It is important to note that this trip to Yemen by the Defendant was a mere few weeks before Umar Farouk Abdulmutallab (a.k.a. "The Underwear Bomber" or "The Christmas Day Bomber") went to Yemen to seek Awlaki and began planning the bombing of a flight carrying 289 innocent people from Amsterdam to Detroit on December 25, 2009. (*Id*. ¶ 15, n.1.).

In all, during the trip to Yemen in July 2009, and an earlier trip taken by co-conspirators in January 2009, the Defendant and his co-conspirators provided approximately $29,000 to Awlaki to support terrorism.  The money was not provided as part of an undercover "sting," but was actually delivered to Awlaki through Awlaki's associates in Yemen.  $29,000 would be sufficient to fund multiple terrorist plots, based on the estimated costs of past terrorism plots.  For example, in November 2010, Al Qaeda in the Arabian Peninsula ("AQAP"), the terrorist group Awlaki helped lead, published an issue of its online, English-language magazine, Inspire, devoted to one of its failed terrorist attacks—an attempt to send bombs hidden in printer cartridges to targets in the United States using cargo planes.  In that issue, an article explained that the cost of the plot was only $4,200.  See Ibrahim, Yahya, "$4,200," Inspire, p. 15, November 2010; Shane, Scott, "Qaeda Branch Aimed for Broad Damage at Low Cost," New York Times, Nov. 20, 2010 (available at http://www.nytimes.com/2010/11/21/world/middleeast/21parcel.html?_r=0).  Thus, the total

amount involved in the conspiracy would have paid the expenses of approximately *seven* printer bomb plots.[1]

In January 2012, the Defendant lied to the Federal Bureau of Investigation about his donations to Awlaki. (*Id*. ¶ 21, Indictment ¶ 274.) He first stated that it was repayment for a loan, a story concocted by the co-conspirators once they knew law enforcement were investigating them. (PSR ¶ ¶ 20-21.) The Defendant only changed his statement after the agents confronted him. (PSR ¶ 21.) He then admitted to lying, admitted he instructed his brother to lie to the authorities, and admitted to going to Yemen to give money to Awlaki. (*Id*.)

The Defendant's support for violent jihad did not end there, however. After being incarcerated pending trial in case 3:15CR358, the Defendant continued to exhort the teachings of Awlaki to another federal inmate. (*Id.* ¶ 25, 29, 34; *See* Plea Agreement ¶ ¶ 35 and 41.) The Defendant repeatedly stated that it was all Muslims' moral obligation to engage in violent jihad and that those who do will be rewarded in the afterlife. (*Id.*) Eventually, the Defendant solicited an inmate to kill the federal judge presiding over the Defendant's case. (PSR ¶ 24.) He made repeated telephone calls to his wife and an undercover agent posing as a "hit man" to ensure it was done. (*Id*. ¶ ¶ 27, 28, 30, 31, 33, 37, 38, 40.) He went into detail about his preference for

---

[1] Media reports on the costs of other terrorist attacks also confirm the significance of the funds provided by the conspiracy to a terrorist such as Awlaki. For example, in November 2015, NBC News reported that several notable terrorist attacks cost less than the amount provided to Awlaki by this conspiracy, including the November 2015 Paris attacks that killed 130 people ($10,000 or less); the 1998 bombings of embassies in Kenya and Tanzania that killed over 200 people ($10,000); the 2000 bombing of the USS Cole in Yemen that killed 17 sailors ($5,000 to $10,000); and the 1993 World Trade Center bombing in New York that killed six people ($18,000). See Windrem, Robert, "Terror on a Shoestring: Paris Attacks Likely Cost $10,000 or Less," NBC News, Nov. 18 2015 (available at http://www.nbcnews.com/storyline/paris-terror-attacks/terror-shoestring-paris-attacks-likely-cost-10-000-or-less-n465711). NPR has also reported on the relatively low cost of conducting terrorist attacks, noting in June 2014 that the 2005 bombings in London that killed 57 people cost approximately $14,000. NPR further reported that a suicide vest can cost as low as $1,200 and a suicide car bomb from $13,000 to $20,000. See Temple-Raston, Dina, "How Much Does a Terrorist Attack Cost? A Lot Less Than You'd Think," NPR, June 30, 2014 (available at http://www.npr.org/sections/parallels/2014/06/25/325240653/how-much-does-a-terrorist-attack-cost-a-lot-less-than-you-think).

having the judge kidnapped and killed to ensure his body was not found to increase his chances of escaping liability. (*Id*. ¶ 25.) To show he truly intended to have the judge killed, the Defendant made a down payment of $1,000 to the supposed hit man. (*Id*. ¶ ¶ 30-33.)

When the Defendant believed the killing of the judge was completed, he continued to advocate the killing of other government officials like former Secretary of State Condoleezza Rice, and former Attorney General Alberto Gonzales. (*Id*. ¶ 29.) Those targets were not by happenstance as the Defendant explained to the other inmate. (*Id*.) Those individuals were targets he believed were responsible for oppressing Muslims: Secretary Rice for the war in Iraq and Attorney General Gonzalez for his role in the Guantanamo Bay Detention Camp, and were former government officials who would have little to no security. (*Id*.)

The facts and circumstances of the offenses show that the Defendant was truly committed to his cause, even to the point of continuing it after his arrest and incarceration. The Defendant went to great lengths to support violent jihad. He closely monitored Awlaki and shared his teachings with others, travelled to Yemen to give thousands of dollars towards the cause, and even from behind bars, attempted to kill a federal judge, all in the name of violent jihad. These facts and circumstances support a long prison sentence, such as the 27.5 years agreed to by the parties.

  **B.**  **History and Characteristics of the Defendant**

The traditional metrics of judging one's history and characteristics for purposes of assessing his dangerousness to the community or likelihood of reoffending do not apply to the Defendant. He is 39 years old. (PSR ¶ 82.) He had a stable upbringing, educated, steadily employed, and does not suffer from any serious mental or physical illness. (*Id*. ¶ ¶ 76-79, 82, 84, 86-89, and 92-96.) He has a soft voice and an outwardly mild personality with no prior criminal history. (*Id*. ¶ 67-68.) However, those factors are not indicative of his true character.

His true character and beliefs lie within the voluminous amounts of communications with his co-defendants, other Awlaki followers, and the government's informant. In those communications, spanning over a decade, he has consistently held the firm belief that the West is at war with Islam and in response, all Muslims must wage violent jihad on any non-believer through whatever means necessary. These beliefs show the necessity of a long prison sentence.

However, based on his age, the Defendant would be in his mid-sixties upon completion of the 27.5 year sentence contemplated in the plea agreement. The Defendant is also not a U.S. citizen and has no status in the United States. He has agreed to a judicial order of removal from the United States. Thus, at the completion of the 27.5 year sentence, the Defendant will be removed from the United States, unlikely to ever be able to return. Based on consideration of the Defendant's personal characteristics, the government again asserts that a 27.5 year prison sentence strikes an appropriate balance in this case.

### C. Deterrence

The Defendant's dedication to his cause shows that a significant sentence of incarceration is necessary to deter him. His conduct while detained pending trial in this case shows that a mere prison sentence will not deter him; it must be a long sentence. A sentence of 27.5 years will prevent the Defendant from engaging in similar conduct again until he is at such an age that he will know that any further offenses would lead to incarceration for the rest of his life.

Similarly, a long sentence such as the 27.5 year sentence in this case will deter others. The support for Awlaki occurred in 2009. The long sentence in this case will inform others that investigators will be persistent in tracking down those who financially support terrorism. Those who are unwilling to fight themselves, but who might follow Awlaki's guidance to support jihad with their wealth so others can fight, will know that they too will be held accountable, even if it

takes years for investigators to bring them to justice.  That is the message this prosecution sends to others who might send money to terrorists.

Finally, the Defendant's plot to kill Judge Zouhary was an attack on the justice system itself.  Defendants must know that attempting to kill a presiding judge will not provide them with anything other than a long prison sentence.  The 27.5 year sentence in this case will make that point clearly for future defendants.

### D. Protect the Public

Incarceration is designed to remove those from society who continue to be a threat to the safety and well-being of the people.  Although the Defendant has accepted responsibility for his criminal conduct, he has not made any statements indicating any regret or remorse.  (PSR ¶ 43.) He has not denounced violent jihad and its violent mission against the West.  (*Id.*)  He has not apologized to the victim.  (*Id.*)  He has also shown an intent to continue his criminal activities while in custody if he is not closely monitored.  A long sentence is therefore needed to protect the public from the Defendant.  As stated earlier, a 27.5 year sentence will incapacitate the Defendant until he is in his mid-sixties, at which time he will be removed from the United States.

### E. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment

The Defendant's committed serious offenses.  He provided funds to a terrorist who sought to attack the United States as part of his cause of violent jihad.  He also attacked the very system of justice, by seeking to obstruct the investigation and then by soliciting the murder of a federal judge.  These are offenses that require a significant sentence.  At the same time, the sentence must also recognize that while the Defendant was successful in providing funds to Awlaki, he was not successful in his plot to murder the presiding judge.  The Defendant also did not personally

participate in any terrorist attacks himself. Further, the Defendant admitted guilt, saving all, including his intended victim, the difficulties and risks of a trial. It is also true that an excessive sentence does not promote respect for the law. The Court must also consider other, similarly situated cases. Although there have been numerous cases prosecuted nationwide involving providing material support to terrorists, and cases involving soliciting the murder of judges, witnesses, or investigators, the combination of a defendant charged with providing material support to terrorists who also solicited the murder of the presiding judge while detained pending trial presents a unique situation with few, if any, specific cases for comparison. The sentence agreed to by the parties takes these factors into account. A sentence of nearly three decades in prison for the Defendant reflects the seriousness of the offense, promotes respect for the law, and provides for just punishment.

## V. Conclusion

The Defendant's motivation and conduct is some of the most serious and egregious presented before a court.  He attempted to attack the United States on multiple fronts, through whatever means necessary, and is unapologetic about it.  However, the terms and conditions of the proposed plea agreement reflect the gravity of this conduct.  He will be incarcerated, likely with little to no outside communication, until he is in his mid-sixties.  Then, he will be removed and permanently barred from the United States, carrying the label of a convicted terrorist whatever he goes.

Based on consideration of all of these factors, the government believes that a sentence of 27.5 years, as contemplated by the plea agreement, is a just and reasonable sentence in this case.  Accordingly, the government respectfully requests the Court to accept the proposed plea agreement and sentence the Defendant consistent with its terms.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

DANIEL L. LEMISCH
Acting United States Attorney

By:  /s/ Michael J. Freeman
     Michael J. Freeman (OH: 0086797)
     Assistant United States Attorney

     /s/ Matthew W. Shepherd
     Matthew W. Shepherd
     Assistant United States Attorney

     /s/ Gregory R. Gonzalez
     Gregory Gonzalez
     Trial Attorney
     National Security Division

CERTIFICATE OF SERVICE

      I hereby certify that on this 30th day of October 2017 a copy of the foregoing document was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

      /s/ Michael J. Freeman
      Michael J. Freeman
      Assistant U.S. Attorney