IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:15 CR 358 |
| v. | ) | No. 3:16 CR 222 |
| | ) | |
| YAHYA FAROOQ MOHAMMAD, | ) | Judge Edmund A. Sargus Jr |
| | ) | |
| Defendant. | ) | |

**DEFENDANT YAHYA FAROOQ
MOHAMMAD'S SENTENCING MEMORANDUM**

Defendant, **YAHYA FAROOQ MOHAMMAD**, by his attorneys, **THOMAS ANTHONY DURKIN** and **ROBIN V. WATERS,** pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker,* 543 U.S. 220 (2005), *Rita v. United States,* 551 U.S. 338 (2007), *Gall v. United States,* 552 U.S. 38 (2007), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Nelson v. United States,* 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), and the written plea agreement governed by Federal Rule of Criminal Procedure 11(c)(1)(C), respectfully submits Defendant's Sentencing Memorandum.

**I.  THE PLEA AGREEMENT, PRE-SENTENCE REPORT,
AND SENTENCING GUIDELINES**

On July 10, 2017, Defendant Yahya Farooq Mohammad pleaded guilty to conspiracy to provide material support or resources to terrorists in violation of 18 U.S.C. § 2339A (Case No. 15-cr-358); and solicitation to commit a crime of violence in violation of 18 U.S.C. § 373(a) (Case No. 16-cr-222). Pursuant to the Plea Agreement, which is governed in part by F.R.Cr.P. 11(c)(1)(C), the parties have agreed that the appropriate sentencing disposition is twenty-seven

and a half years' (27.5) imprisonment.[1] Furthermore, Defendant has agreed in his Plea Agreement to the entry of a stipulated judicial order of removal. (Plea Agreement, p.3, ¶7). The Court has deferred acceptance of Defendant's 11(c)(1)(C) plea agreement pending the outcome of the Presentence Investigation.

A district court has broad discretion to accept or reject a plea agreement. *See generally*, *United States v. Moore*, 916 F.2d 1131 (6th Cir. 1990)(citing *Santobello v. New York,* 404 U.S. 257, 262 (1971); *see also United States v. Delegal,* 678 F.2d 47 (7th Cir.1982) ("While a defendant has no absolute right to have a guilty plea accepted, a court must exercise sound discretion in determining whether or not to reject a plea. Thus, a defendant is entitled to plead guilty unless the district court can articulate a sound reason for rejecting the plea.") (citations omitted). A district court may accept or reject an 11(c)(1)(C) plea agreement "based on its determination that the agreement was not involuntary or unfair." *United States v. Scurlark*, 560 F.3d 839, 842 (8th Cir. 2009) (internal quotations omitted). *See also*, *United States v. Kling*, 516 F.3d 702, 704 (8th Cir. 2008). In deciding whether to accept an 11(c)(1)(C) plea agreement, the district court should bear in mind the public interest, and must consider the characteristics of the Defendant and the factors set forth in 18 U.S.C. § 3553(a). *See generally*, *United States v. Orthofix, Inc*., 956 F.Supp. 2d 316 (D. Mass. 2013)(analyzing the application of 11(c)(1)(C) plea agreements to corporate defendants). For all the reasons set forth below, counsel submit that would be within the sound discretion of the Court to accept the agreed sentence of 27 ½ years, as it is a disposition that is

---

[1] Specifically, the parties agreed in the written plea agreement to a specific sentence of 180 months (15 years) imprisonment on Count One in the 2015 case, and a specific sentence of 240 months (20 years) imprisonment on Count Two of the 2016 case, with 90 months (7.5 years) to run concurrently and the remainder (150 months) to run consecutively, resulting in a total combined sentence of 330 months or twenty-seven and a half years total. (Plea Agreement, p 8-9, ¶21).

both in the public interest and sufficient, but not greater than necessary, to effectuate each of the goals of federal sentencing delineated at 18 U.S.C. § 3553(a).

The Presentence Investigation Report ('PSR") prepared by Probation was filed on October 23, 2017. (Dkt. 272).[2] The Sentencing Guidelines calculations contained in the PSR differ from those agreed to by the parties in the Plea Agreement in one respect. (PSR, p.18, ¶103). The Probation Officer concluded that a two-level increase for obstruction of justice (U.S.S.G. § 3C1.1) applied to Count One (PSR, p.11, ¶49), while the parties did not. Consequently, the Probation Officer's calculation results in a Total Offense Level 53, while the parties' calculation results in a Level 52.

Solely for the record, counsel object to the applicability of the obstruction of justice enhancement. However, in the final analysis, the application of the enhancement does not affect the outcome of the applicable guideline range. As the Probation Officer noted in the PSR, in the rare circumstances where the Total Offense Level exceeds Level 43, the total Offense Level will be treated as a level 43; *i.e.*, life. (PSR, p.13, ¶65). Additionally, when the statutorily authorized maximum sentence is less than the applicable guideline range, the statutory maximum sentence shall be the applicable guideline sentence. *See* U.S.S.G. § 5G1.1(a). Accordingly, the applicable guideline sentence is the statutory maximum sentence of thirty-five years (420 months). (PSR, p.18, ¶102).

The Probation Officer also concluded that Defendant is assigned zero criminal history points under the Guidelines. (PSR, p.13, ¶69, 70). However, due to the terrorism enhancement under U.S.S.G. § 3A1.4(b) the resulting Criminal History Category is IV. *Id*. at ¶71.

---

[2] Counsel have no technical objections to the PSR. However, counsel would like to note one small clarification. On page 2 of the PSR, there are a number of "Aliases" listed, as well as an "Alias DOB." For the record, Defendant has used the named Yahya F. Mohammad, Yahya Mohammad, and Farooq Mohammad, but is unfamiliar with the additional aliases listed. Defendant is also unaware of the Alias DOB listed.

Counsel will not belabor the applicable guideline range, and do not dispute the applicability of the terrorism enhancement as a matter of law. However, as this Court is no doubt well aware, since *United States v. Booker*, 543 U.S. 220, 264 (2005) the applicable Guideline range has been advice this Court should consider but is not required to follow. And, even as advice, the Guidelines themselves can be flawed, as the United States Supreme Court suggested in *Nelson v. United States*, 555 U.S. 350, 351 (2009), "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." Nevertheless, the Guidelines remain a "starting point" and "initial benchmark" for this Court to consider in the determination of a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007). Likewise, in *Gall* the Supreme Court directed the sentencing judge to "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

## II.  THE AGREED SENTENCE OF 27 ½ YEARS IS SUFFICIENT BUT NOT GREATER THAN NECESSARY UNDER 18 U.S.C. § 3553(a)

To arrive at a just sentence that is "sufficient but not greater than necessary," the Court must consider the factors set forth in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, and the history and characteristics of the Defendant. § 3553(a)(1).[3] In this regard—

---

[3] 18 U.S.C. § 3553(a) *Factors to be considered in imposing a sentence*, provides as follows: The court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and, (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and, (7) the need to provide restitution to any victims of the offense.

despite the seriousness of Defendant's conduct—there are certainly public interest and § 3553(a) factors that weigh strongly in favor of the 27 ½ year agreed sentence.

The factual basis for Defendant's guilty plea to Count One of the 2015 case and Count Two of the 2016 case is set forth on pages 11-15 of Defendant's Plea Agreement. (Plea Agreement, p. 11-15). Defendant admitted in the Plea Agreement that he conspired to provide material support and resources to Anwar Al-Awlaki, intending the funds were to be used for the carrying out of specific delineated offenses (18 U.S.C. §§ 1114, 2332, 2332(b)). (Plea Agreement, p.11).

However, as defense counsel have argued from the outset regarding the 2015 case, despite the seriousness of this conduct, the government simply could not link Defendant's provision of funds to Awlaki to the Underwear Bomber (Umar Farouk Abdulmutallab) or the Fort Hood Shooter (Nidal Hasan)—as one might have guessed it could by reading the Indictment. (*See* Indictment, p. 10-12).[4] The Court's own opinion granting Defendant's requests for the source of funding of the Fort Hood Shooting to shield Defendant from the government's suggestion in this regard illustrates defense counsel's point:

> It is almost inescapable that jurors would infer from the discussion that Farooq's alleged material support somehow funded the shooting. To shield himself from this inference, Farooq could present evidence of the true source of Hasan's funding. Or alternatively, the parties could enter into a stipulation that Hasan's funding did not come from Defendant or al-Awlaki. Evidence of Hasan's funding sources, or an appropriate stipulation, would also help Farooq rebut an assertion at sentencing that the relevant conduct in the case includes the shooting… the evidence must be disclosed under Rule 16(a)(1)(E)(i) and *Brady* absent the parties entering into a stipulation.

Opinion & Order (Dkt. 242) p. 9. After the issuance of this opinion the government indicated that the Fort Hood Shooting was self-funded by Nidal Hasan.

---

[4] The government argued in its response to Defendant's Motion for Discovery Concerning Sources of Terrorism Related Funding that it never claimed the Fort Hood Shooter received funding from Defendant or Awlaki. *See* Dkt. 166, p.10. However, the Indictment allowed the suggestion to hang in the air.

5

Using similar reasoning, the Court also granted Defendant's discovery requests for communications about the funding of Abdulmutallab's attempted bombing. *See*, Opinion & Order, Dkt. 242, p. 11-12, ("The jury could reasonably reject the Government's theory that, due to the fungibility of money, any resources provided to al-Awlaki made their way to a single pool of funds. The jury could, instead, credit a defense theory proposing that al-Awlaki was engaged in both benign and illicit activities and that he strictly partitioned funds along those lines. Farooq could, thus, undermine the Government's pool of funds theory through evidence of how al-Awlaki's funds were maintained and spent."). When the government tendered materials regarding Abdulmatallab's sources of funding and the communications regarding the attack, none of the materials tied Defendant's provision of funds to Awlaki to Abdulmutallab. *See e.g.,* Govt Discovery Letter, November 16, 2016.

In plain point of fact, counsel believe that the evidence at trial could just as easily have supported the articulated theory of defense that Defendant intended to provide support to Awlaki's charitable and educational pursuits, and not his purported terrorist activities. This was the basis of counsels' argument throughout the pre-trial proceedings that because Awlaki had not been designated as a Specially Designated Terrorist at the time of the donation, the government was legally forced to shoehorn a § 2339B case into a far more proof onerous § 2339A case. *See, e.g.*, Defendant's Motion for Inspection of Grand Jury Minutes, Dkt. 84.

The facts of the 2016 case are also most certainly quite troubling and extremely serious. But here, too, serious evidentiary issues support the fact that the 27 ½ year agreed sentence weighs in the public's interest. In short, Defendant admitted pursuant to his Plea Agreement that he solicited another person to kill U.S. District Court Judge Jack Zouhary. (Plea Agreement, p. 13-15). This offense began when an extremely manipulative and totally unreliable fellow inmate in

the Lucas County Corrections Center (Individual A) intentionally befriended Defendant. Almost immediately, Individual A seized on Defendant's religious beliefs by feigning interest in conversion to Islam. Using this clever maneuver, he was able to ingratiate himself to Defendant by falsely explaining that Judge Zouhary had oppressed Muslims, and had a role in the detention of Muslim men in Guantanamo Bay, Cuba. No doubt, Individual A saw Defendant as his get out of jail free card from his 40-year state court sentence of imprisonment, as well as pending state and federal charges. Accordingly, Individual A skillfully concocted what can only be described as an asinine plan to kill Judge Zouhary.[5]

Individual A eventually realized that the government could not wave a wand and forgive his 40-year state court sentence, nor assist him to his satisfaction with his pending federal case and pending state court case. And, as the Court is aware from Defendant's Motion for Defense Witness Immunity; Or in the Alternative, for the Missing Witness Instruction (Dkt. 41), Individual A ultimately ceased cooperating with the government's investigation and sent a number of letters to Defendant's wife requesting that she have undersigned counsel come to visit him. *Id*. at 7-8. Individual A also went so far as to send undersigned counsel a letter. *See* Defendant's Motion to Continue Trial Date, Dkt. 246, Sealed Exhibit A. The government actually intended to try to keep Individual A off of the witness stand,[6] and by the time of trial, Individual A was a likely defense witness. Put another way, as civil lawyers often do, each side had its own "litigation risks."

In short, nothing could excuse Defendant's assent to this absurd plot captured on the tape recordings. While Defendant could have shown quite clearly that Individual A used Defendant's

---

[5] For but one example of the asininity of the "plot," Individual A suggested that if Judge Zouhary was off the case, Defendant's co-defendant brother might stand a better chance of being released.

[6] No doubt this was a smart move by the government. The judge who once sentence Individual A to 40 years' imprisonment "a compulsive liar and manipulator." Defendant's Motion for Defense Witness Immunity; Or in the Alternative, For the Missing Witness Instruction, Dkt. #41 (Case No. 16 CR 222), p.2.

religious beliefs to manipulate him into this senseless plan, the tape recordings made a defense highly risky and improbable. Certainly, these factors weigh in favor of the agreed 27 ½ year sentence insofar as the public interest is concerned.

In addition to the nature and circumstances of the offense, the Court must also consider the history and characteristics of the Defendant in imposing a sentence that is sufficient but not greater than necessary. Here too, there are substantial reasons the 27 ½ year agreed sentence is appropriate. Defendant Yahya Farooq Mohammad, now thirty-nine years old, was born in Sharjah, UAE, and is of Indian decent.  (PSR, p. 14, ¶76).  His parents were well educated—his mother was a gynecologist and his father, now deceased, was a civil engineer. *Id*. Defendant is the third of four children. His brother, Ibrahim Mohammad, is also charged in the 2015 case. One of his sisters lives in the United States, and the other lives in the UAE. *Id*.

Defendant lived in the UAE until he was thirteen years old, and then moved to India for school. (PSR, p.14, ¶78). He studied at St. Mary's Junior College in India for four years and graduated in 1995, for the equivalent of his high school education. (PSR, p.15, ¶86). He then attended the Muffakham College of Engineering and Technology in Hyderabad, India, where he obtained his Bachelor of Engineering degree in electrical engineering in 1999. *Id*. ¶87. In August of 1999, Defendant traveled to the United States for the first time to attend Louisiana State University in Baton Rouge, Louisiana. (PSR, p.15, ¶88). While at LSU, he worked as a teaching assistant, and in 2001, he earned a Master's degree in electrical engineering. *Id*. Defendant next attended The Ohio State University in Columbus, Ohio to obtain is Ph.D. in electrical engineering. *Id*. ¶89. He attended OSU from 2002 until 2004—but left prior to obtaining his Ph.D. when his mother fell ill in the UAE. *Id*. Upon returning to the UAE, Defendant worked as a software engineer and IT project manager until his arrest. Id. ¶92-96.

8

Defendant married his wife, N.T., a U.S. citizen, in 2008. (PSR, p.14, ¶80). Defendant and his wife have three daughters, age eight, six, and four. *Id*. Counsel have attached numerous letters addressed to the Court from Defendant's family and friends, which attest to Defendant's close relationship with his daughters and wife, and describe the serious impact his already lengthy incarceration has had on his young children.[7]

After considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court is charged with fashioning a sentence that is sufficient, but not greater than necessary—taking into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D).

Certainly, a 27 ½ year sentence sends a strong message that provides both general deterrent effect, and similarly promotes respect for the law. Moreover, at age 39, Defendant likely will not be released on a 27 ½ year sentence until he reaches approximately 61 years of age—taking into account good time served and the two years he has already served in pre-trial detention. Based upon his age alone, the specific deterrence sentence goal will also be served in that the older a Defendant becomes, the less likely he is to re-offend.

Defendant also faces deportation to India at the conclusion of his custodial sentence. Defendant agreed in his Plea Agreement to the entry of a stipulated order of removal, to assist in the execution of his removal, and to concede that the entry of the judicial order of removal renders him permanently inadmissible to the United States. *See* Plea Agreement, p. 3-6; *see also*, 8 U.S.C.

---

[7] These letters have been filed under seal as Exhibit A.

§ 1227(a)(4)(B) (*Terrorist activities*), providing that that "any alien who is described in [INA § 212(a)(3)(B) or (F)] is deportable;" *see also* 8 U.S.C. § 1182(a)(3)(B) (broadly defining "terrorist activities").

The sheer severity of this consequence is relevant to the Court's consideration of an appropriate sentence, and weighs in favor of the agreed sentence. First, deportation on the grounds faced by Defendant entails further mandatory detention and imprisonment—even taking into account the agreement to an order of removal.[8] In general, a deportable noncitizen with a valid passport who accepts a final order of removal and agrees to waive the proceedings before an Immigration Judge can be removed to his/her home country in as much time as it takes Immigration and Customs Enforcement/Enforcement and Removal Operations ("ICE/ERO") to complete the necessary paperwork, get necessary approvals from the home country, and make arrangements for the trip. However, Defendant's terrorism conviction is likely to slow this process—as India could well resist or delay Defendant's return.

Defendant's deportation, and the concomitant prolonged immigration detention is most certainly a relevant factor for the Court to consider when determining a sentence sufficient but not greater than necessary. Deportation often can be said to mitigate the amount of imprisonment necessary to punish a defendant because deportation is significant punishment unto itself; and, because it mitigates the need to impose a long prison sentence for the public's protection. *See, e.g.*, *Jordan v. De George*, 341 U.S. 223, 232 (1951) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts."). His deportation therefore promotes and reflects several of the other the sentencing goals of 18 U.S.C. § 3553(a)(2)(A)-(C) in that deportation itself—which would likely separate Defendant from his

---

[8] Removability under 8 U.S.C. § 1227(a)(4)(B) subjects an individual to mandatory detention. See 8 U.S.C. § 1226(c)(1)(D).

10

wife, children, sister and other relatives who live in the U.S.—reflects the seriousness of the offense. It can also be said to promote respect for the law and to provide just punishment for the offense. This very severe consequence also addresses the Court's need to fashion a sentence which provides general deterrence. Banishment from the U.S. to a life of exile in India after a 27 ½ year sentence is certainly something that the public would perceive as a harsh consequence of this conviction. Such a consequence can also be said to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

The consequence of deportation also has further implications for Defendant's conditions of confinement, and courts have also imposed below-Guidelines sentences based upon the recognition that aliens face more severe restrictions in prison than non-aliens. *See e.g.*, *U.S. v. Pacheco-Soto*, 386 F. Supp. 2d 1198 (D.N.M. 2005) (deportable alien convicted of drug crime sentenced to 60 months, rather than minimum guideline term of 74 months, in light of his ineligibility for early release, minimum security prison, or credits for participation in residential drug or alcohol abuse program).

### III. <u>CONCLUSION</u>

Respectfully, the Court should exercise its discretion and impose the agreed 27 ½ year sentence. It results from a recognition by both parties that it is a fair compromise under the very unique circumstances of this very unusual case. It is, perhaps, fair to say that neither side is necessarily pleased with the result of these negotiations. Pleased or not, that is often said to be the definition of a good settlement or compromise. This litigation would have been protracted and ugly, to say the least. Tremendous prosecutorial and judicial resources would have been expended—not to mention the risk that certain national security issues could well have been further litigated if the case proceeded to trial. *See* Defendant's Motion to Suppress Evidence Obtained or

Derived from Warrantless Surveillance Under Section 702 of FISA, Dkt. 146.  Certainly it is also not outside the realm of possibility that discovery effecting national security could have been impacted—not to mention the unresolved issue of bringing in Mr. Abdulmutallab to be a defense witness.  Like it or not, therefore, this result must be said to be in the interests of the public, the Court, the government, and the Defendant.

                                           Respectfully submitted,

                                           /s/ Thomas Anthony Durkin
                                           **THOMAS ANTHONY DURKIN,**

                                           /s/Robin V. Waters
                                           **ROBIN V. WATERS,**
                                           Attorneys for Defendant.

**DURKIN & ROBERTS**
2446 N. Clark Street
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

## **CERTIFICATE OF SERVICE**

      Thomas Anthony Durkin, Attorney at Law, hereby certifies that the foregoing Defendant Yahya Farooq Mohammad's Sentencing Memorandum, was served on October 30, 2017, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                               /s/ Thomas Anthony Durkin
                                               **THOMAS ANTHONY DURKIN**
                                               2446 N. Clark St.
                                               Chicago, IL 60614
                                               (312) 913-9300
                                               tdurkin@durkinroberts.com