# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:15-CR-358 |
| Plaintiff, | |
| | JUDGE HELMICK |
| -vs- | **MOTION TO JOIN CO-DEFENDANT MOTION IN LIMINE** |
| | |
| | David Klucas (0041188) |
| **IBRAHIM MOHAMMAD,** | 1900 Monroe Street |
| | Toledo, Ohio 43624 |
| Defendant. | PH: (419) 255-1102 |
| | FX: (419) 255-1415 |
| | Davek@buckeye.access.com |
| | Attorney for Defendant Ibrahim Mohammad |

Now comes Defendant Ibrahim Mohammad, through counsel, who respectfully requests an Order from this Court permitting him to join the Motion in Limine filed by Co-Defendant Sultane Salim (Doc. 271). Mr. Mohammad incorporates by reference the arguments advanced in that Motion in Limine. He submits the following Memorandum as additional support for the relief requested in that motion.

Respectfully Submitted,

/s/ David Klucas
David Klucas
Attorney for Defendant Ibrahim Mohammad

**Memorandum**

Mr. Mohammad is charged with Conspiring to Provide Material Support to Terrorists, Providing Material Support to Terrorists, Conspiracy to Commit Bank Fraud, and Conspiracy to Obstruct Justice (Doc. 1).  Co-Defendant Sultane Salim filed a Motion in Limine to exclude the testimony of the Government's proposed expert witness, Dr. Alexander Meleagrou-Hitchens (Doc. 271).  The Government filed a memorandum opposing the motion and seeking denial without a hearing (Doc. 287).  Mr. Mohammad submits this additional memorandum to highlight the application of the law cited in those pleadings in support of his request to exclude the testimony of Dr. Meleagrou-Hitchens.

On 1 December 2016, the Government notified Mr. Mohammad that it will call Dr. Alexander Meleagrou-Hitchens as an expert on international terrorism, the global jihad movement, Anwar Al-Awlaki's biography, ideology, published works and remarks, and his role and influence on the global jihad movement.  A copy of this disclosure is attached to this motion as Exhibit A.  The disclosure contains the following summary of Dr. Meleagrou-Hitchens's proposed testimony:

> We anticipate that Dr. Meleagrou-Hitchens will testify that Anwar al-Awlaki openly supported violent jihad against the United States and other non-Muslim nations and people who he deemed to be at war with Islam.  Further, we anticipate that he will testify that Awlaki's support for violent jihad was manifested no later than 2005, when his translation and interpretation of *Constants on the Path of Jihad* was published.  According to Dr. Meleagrou-Hitchens analysis, Awlaki's lectures, writings and blog entries openly advocated violent jihad as the priority of what Awlaki deemed to be all "true Muslims."  He is expected to testify that Awlaki's use of the term "jihad" referred exclusively to violent

jihad, not to an internal struggle of the individual or a peaceful, non-violent advocacy of the faith.

Dr. Meleagrou-Hitchens is expected to explain the global jihadist movement and Awlaki's unique role within it, particularly as it pertains to Awlaki's appeal to English-speaking Muslims in Western countries. This testimony is expected to include a description of Awlaki's evolution from his time in the United States to becoming an operational terrorist in Yemen. According to Dr. Meleagrou-Hitchens, Awlaki's early works prior to the publication of *Constants on the Path of Jihad* are consistent with his later, more explicitly pro-violence and pro-jihad writings.

Dr. Meleagrou-Hitchens will also testify to his review of communications of the co-defendants and specific writings by Awlaki shared among the co-defendants. He is expected to testify that the communications of the co-defendants are consistent with Awlaki's ideology of violent jihad. Further, he is expected to testify that based on his review of their communications and the materials produced by Awlaki that they shared, that the co-defendants were aware of Awlaki's support for violent jihad and they supported Awlaki's goal of violent jihad at the time they conspired to provide and did provide funds to Awlaki. He is also expected to testify that at the time they provided funds to Awlaki, Awlaki had advocated that religious study should not take precedence over the participation in violent jihad.

Dr. Meleagrou-Hitchens is also expected to testify about the meaning of specific writings by Awlaki, including *Constants on the Path to Jihad, 44 Ways to Support Jihad*, and other works. He is expected to testify that these works refer to violent jihad, and cannot reasonably be interpreted to refer to peaceful, non-violent advocacy.

Dr. Meleagrou-Hitchens' opinions and testimony will be based on his review of the works of Awlaki referred to in the indictment, his review of the communications of the co-defendants referred to in the indictment, and his years-long study of Awlaki and the global jihadist movement in general. His study of Awlaki has included primary materials produced by and about Awlaki, as well as studying and research of other experts who have studied Awlaki and the global jihad movement. His testimony is expected to be consistent with his analysis of Awlaki in "As American as Apple

3

>Pie: How Anwar al-Awlaki Became the Face of Western Jihad," a policy report published by the International Centre for the Study of Radicalisation and Political Violence, King's College London, which included a detailed analysis of Awlaki's history, works, and role in the global jihad movement.

Distillation of the applicable law cited by Mr. Salim and the Government reveals that relevance and reliability are the barometers of admissibility. Primary guidance is found in Evidence Rule 702:

>Rule 702.  Testimony by Expert Witnesses.
>
>A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>(b) the testimony is based on sufficient facts or data;
>
>(c) the testimony is the product of reliable principles and methods; and
>
>(d) the expert has reliably applied the principles and methods to the facts of the case.

Expert testimony satisfies the requirements of Evidence Rule 702 if the witness is qualified; the testimony is relevant, meaning it assists the trier of fact to determine a fact in issue; is reliable; and is not unduly prejudicial. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d. 469 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 149 L.Ed.2d. 238 (1999); *U.S. v. Stone*, 279 F.R.D. 434 (E. D. Michigan, 2012). The burden is on the Government to demonstrate admissibility by preponderant evidence. *Daubert*, at 592, n. 10, 113 S.Ct. 2786.

The proposed testimony of Dr. Meleagrou-Hitchens fails to meet these criteria. Mr. Mohammad is charged with providing and conspiring to provide material support or resources to Anwar Al-Awlaki, knowing or intending that they are to be used in preparation for, or in carrying out, the offenses of killing of officers and employees of the United States, killing of U.S. nationals, and acts of terrorism transcending national boundaries (Doc. 1, ¶26). The indictment alleges that more than 8 years ago, Mr. Mohammad conspired to provide approximately $22,000.00 to Anwar Al-Awlaki for the purpose of committing one of those offenses. That is the Government's accusation, and that defines what is relevant.

The scope of Dr. Meleagrou-Hitchens's anticipated testimony is too broad. There is no evidentiary nexus between much of what Dr. Meleagrou-Hitchens offers and the charged offenses. For instance, the Government proposes to elicit testimony from Dr. Meleagrou-Hitchens about the "global jihad" movement. There is no evidence connecting Mr. Mohammad to any "global jihad" movement, real or imagined. Mr. Mohammad never belonged to, associated with, or had any contact with any suspicious organization or any known or suspected terrorists. This fact remains true even though it is clear from the discovery disclosures that the Government was monitoring Mr. Mohammad for several years.

This evidence, unrelated to the offenses, is not permitted. In *U.S. v. Amawi*, 552 F.Supp.2d. 669 (N. D. Ohio 2008), the court excluded the same kind of irrelevant testimony, finding that it had no probative value:

> 'Terrorism' generically, or as practiced specifically by various groups with which the defendants have no connection, is not, however, a proper subject for evidence in this case.
>
> . . .

5

> In my view, it is of crucial importance that the evidence in this case relate to what the indictment charges, criminal code prohibits and penalizes, and defendants did and wanted to do, rather than what others, with whom the defendants had no affiliation, have done, continue to do and want to do. This is so, even though, according to the government, the defendants held views similar to, and perhaps in accordance with, those other groups and persons, and viewed their objectives and goals favorably.
>
> . . .
>
> As noted, this is not a case about Islam, jihadist movements or Terrorism. This is a case about whether specific acts violated federal criminal laws.
>
> *U.S. v. Amawi*, 552 F.Supp.2d. 669, 672, 674 (N. D. Ohio 2008).

This directive prohibits any of the expected testimony addressing any specific terror group or individual terrorist, since there is no evidence that Mr. Mohammad belonged to or endorsed any group or individual. This includes any expected testimony addressing Al-Qaeda, Al-Qaeda in the Arabian Peninsula, Nidal Hasan, and Umar Farouk Abdulmutallab. None of that has any bearing on whether Mr. Mohammad provided material aid to Anwar Al-Awlaki to commit an act of terror. As the Court did in *Amawi*, this Court should examine Dr. Meleagrou-Hitchens's expected testimony "with a deliberately narrow field of focus." *Id*. at 672. This examination reveals that Dr. Meleagrou-Hitchens has little to offer.

This focused approach was utilized in *U.S. v. Stone*, 279 F.R.D. 434 (E. D. Michigan 2012). There, the defendants were charged with seditious conspiracy, conspiracy to use weapons of mass destruction, and other charges arising from an alleged scheme to overthrow the government by violent means. The defense moved to exclude the testimony of a proposed government expert, who intended to testify about conspiracy subcultures, beliefs, and theories.

In granting the motion for exclusion, the court held:

> The absence of fit between Dr. Barkun's proposed testimony and the issues is exemplified by some of the topics covered in the Government's Rule 16(a)(1)(G) summary and during the hearing. These include: the history of FEMA detention centers; the standoff at Ruby Ridge; the standoff at Waco, Texas; the Oklahoma City bombings; and the September 11, 2001 attacks in New York and Washington, D.C. ("9/11 attacks").  The Government does not allege that Defendants were involved in these occurrences; they are not relevant to the facts alleged in the indictment.

*Id.* at 438

The disconnect between the accusations in the indictment and Dr. Meleagrou-Hitchens's proposed testimony, as outlined in the Government's notice, is as complete as the disconnect in *Stone*.  This case is not about the global jihad movement, international terrorism, the shooting at Fort Hood, the attempted destruction of Northwest Airlines Flight 253, or any of the other exercises in terrorism with which Mr. Mohammad does not belong, did not participate, and has no connection.

The temporal scope of Dr. Meleagrou-Hitchens's proposed testimony is another example of its irrelevance.  The Government suggests that Dr. Meleagrou-Hitchens should be permitted to testify about Al-Awlaki's writings, attitudes, proclamations, and activities after the incidents in the indictment.  Again, this case is not about anything pertaining to Anwar Al-Awlaki that occurred after Mr. Mohammad disavowed him in early 2010, a disavowal that is borne out by the forensic analysis of Mr. Mohammad's internet browser history and emails disclosed by the Government.  After early 2010, Mr. Mohammad's emails and chat histories show that he disavowed Anwar Al-Awlaki and did not support his terrorist views.  This was six months before the Government labeled Anwar Al-Awlaki a terrorist.

The Government claims that Al-Awlaki's later writings and inflammatory lectures are necessary to understand the criminal qualities of Al-Awlaki's earlier writings.  The Government says "an in depth examination of Al-Awlaki's rise as a Salafi-jihadist theologian and his descent into the realm of operational terrorism" and "a deep dive into the Salafi-jihadi interpretation of Islamic jurisprudence and reasoned comparison of Al-Awlaki's works" is necessary to prove what the defendants knew.  None of this is necessary to decide this case.  If these tracts exhort readers to kill U.S. nationals, that exhortation is obvious.  It does not require expert testimony anymore than the jury needs expert testimony to know terrorism is bad.  A similar Government argument was rejected by the *Amawi* Court, which held that evidence that is purported to be criminal, or probative of criminal behavior, is invariably obvious, and expert explanation is not necessary.  *U.S. v. Amawi*, 541 F.Supp.2d. 945, 951 (N. D. Ohio 2008).

Another flaw in the proffered testimony of Dr. Meleagrou-Hitchens is the events of 2005 to 2009 are being assessed with the benefit of 2015 hindsight.  Certainty always increases after the fact.  All of the testimony in this case, including Dr. Meleagrou-Hitchens's proposed testimony, needs to be limited to what was known in 2005 to 2009, not what was learned subsequently.  This cannot be overstated.  This case is about what the defendants did and did not do based on what they knew from 2005 to 2009.

Allocation of other components of Evidence Rule 702 also militate against the admissibility of Dr. Meleagrou-Hitchens's expansive testimony.  While Dr. Meleagrou-Hitchens is qualified as an Anwar Al-Awlaki biographer, his qualifications for other aspects of his anticipated testimony is suspect.  His expected testimony that Mr. Mohammad shared Al-Awlaki's asserted ideology of "violent jihad," and that Mr. Mohammad supported this ideology

8

at the time of the alleged conspiracy, rests on thin foundational ice.

The obvious deficiency is that Dr. Meleagrou-Hitchens does not know Mr. Mohammad, never interviewed Mr. Mohammad, his friends, colleagues, associates, family, or anyone else. He bases his purported conclusion on two contentions: the email communications between the defendants and his interpretation of some of Al-Awlaki's writings.  Neither of these contentions provide an adequate foundation for his testimony.

Understanding that the admissibility of expert testimony of a social science nature is assessed by somewhat less literal Evidence Rule 702 standards, some evidence of accepted methodology and reliability are still required.  *Kuhmo*, *supra*.  Furthermore, Evidence Rule 702(b) requires that the opinion be based on sufficient facts or data.  Those sufficient facts are absent here, and by what reliable method Dr. Meleagrou-Hitchens can draw his conclusion that Mr. Mohammad was an adherent of Al-Awlaki's supposed declaration of "violent jihad" remains a complete mystery.  Not only does Dr. Meleagrou-Hitchens know nothing about Mr. Mohammad, there is no disclosure of what "communications between defendants" he reviewed. Did Dr. Meleagrou-Hitchens read all 100,000 emails disclosed by the Government?  Unlikely.  If he had, he would have seen there is not a single email in the 100,000 where Ibrahim hopes somebody gets killed.  His conclusion is based on less than one percent of the emails, unsupported by any additional interaction with Mr. Mohammad or anyone who knows him.  It is important to remember that Mr. Mohammad has no history or relationship with the remaining co-defendants.  Excluding his brother, whose case is severed and resolved, none of Mr. Mohammad's friends, associates, family, or colleagues are in any way implicated in this case. Dr. Meleagrou-Hitchens knows nothing about Mr. Mohammad and is unqualified to offer an opinion

9

regarding Mr. Mohammad's ideology.

Dr. Meleagrou-Hitchens also bases his assertion of Mr. Mohammad's support of "violent jihad" on some of Al-Awlaki's earlier writings that appear in the indictment and discovery. There is particular emphasis on the *Constants on the Path to Jihad* and *44 Ways of Supporting Jihad*. Mr. Mohammad contends there is insufficient factual foundation for Dr. Meleagrou-Hitchens to claim these materials prove Mr. Mohammad's commitment to "violent jihad," whatever that may be. What the Government advances as qualifications for Dr. Meleagrou-Hitchens boil down to "I know it when I see it." This manner of expert qualification was summarily rejected by the *Daubert* appellate court on remand. "We've been presented with only the experts' qualifications, their conclusions, and their assurances of reliability. Under *Daubert*, that's not enough." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d. 1311, 1319 (9th Cir. 1995).

The Government, through Dr. Meleagrou-Hitchens, advances the argument that exposure equals acceptance. This is weak. As Co-Defendant Sultane Salim asserts in his motion in limine, reading *Mein Kompf* does not make the reader a Nazi. Nor does reading the *Turner Diaries* make one a white supremist or reading the *Communist Manifesto* make one a communist. This was the sort of Government thinking that drove the McCarthy hearings. As a country, our intellectual standards have evolved since then, one hopes.

The second problem with relying on these writings is that the Government can only prove access. They cannot prove actual exposure. If the foundation fact of reading these materials is absent, they have no relevance to Mr. Mohammad.

*Constants on the Path to Jihad* came to Mr. Mohammad as an email attachment in 2007.

10

It was not downloaded, accessed, stored, or forwarded to anyone.  The thousands of emails Mr. Mohammad exchanged after 2007 do not mention this piece of writing.  The forensic evidence suggests Mr. Mohammad never read it.

*44 Ways of Supporting Jihad* was introduced to Mr. Mohammad via double link.  He received a email with a link to the home page of Anwar Al-Awlaki's blog which then linked to the tract *44 Ways of Supporting Jihad.*  Once again, forensic evidence shows this tract was neither downloaded, discussed, or forwarded to anyone; it is unlikely that Mr. Mohammad even looked at it.  In fact, all of the references of Dr. Meleagrou-Hitchens to writings posted on Anwar Al-Awlaki's blog suffer from this foundation failure.  Mr. Mohammad's browser and email history reveal only two visits to Anwar Al-Awlaki's blog over the course of several years, with an average duration of 51 seconds per visit.

All of these problems with Dr. Meleagrou-Hitchens's anticipated testimony amplify the obvious credibility limitation of Dr. Meleagrou-Hitchens: he claims that Mr. Mohammad knew that Anwar Al-Awlaki was a terrorist bent on killing Americans as early as 2005, and anyone familiar with Anwar Al-Awlaki should have known it as well.  In this assessment, Dr. Meleagrou-Hitchens is completely alone.  Nobody, not any other scholar or expert, not even the United States Government with all its intelligence resources, advances this conclusion.  The Government did not designate Anwar Al-Awlaki a terrorist after these writings were published. Dr. Meleagrou-Hitchens is offered as an expert to testify that Mr. Mohammad knew what nobody else knew, based on a few emails and some tracts that he did not read.  Evidence Rule 702 requires more.

A composite of all these deficiencies is capped by the improper purpose for which the

testimony of Dr. Meleagrou-Hitchens is ultimately offered.  Despite the window dressing, the Government offers Dr. Meleagrou-Hitchens to "prove" that the defendants gave money to Anwar Al-Awlaki "knowing and intending that it was to be used in preparation for or carrying out the killing of officers and employees of the United States, the killing of U.S. nationals, and acts of terrorism transcending national boundaries."  This evidence is specifically prohibited by Evidence Rule 704(b): "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."

The cases cited by the Government in their Memorandum Opposing Co-Defendant Salim's Motion in Limine is distinguishable from the circumstances here.  In a general sense, the Government's cited authority involving explanatory expert testimony fails for the same reason that it failed in *Amawi*:

> Finally, I find the government's recitation of and reliance on cases involving expert explanatory testimony about organized crime, e.g., *U.S. v. Tocco*, 200 F.3d 401, 418 (6th Cir.2000), and drug rings, e.g., U.S. v. Thomas, 74 F.3d 676, 682 (6th Cir.1996), *abrogated on other grounds*, Morales v. American Honda Motor Co., 151 F.3d 500, 515 (6th Cir.1998), to be inapposite. In such cases, the government is attempting to show the defendant's connection with and role in the group. That's not so here, where there is no basis for connecting any of the defendants with a particular group.

> *U.S. v. Amawi*, 541 F.Supp.2d. 945, 952 (N. D. Ohio 2008).

A close examination of the cases relied on by the Government reveals the existence of an identified terrorist organization and a defendant's participation or endorsement.  *U.S. v. Chandia*, 514 F.3d. 365 (4th Cir. 2008) addresses defendants involved with the Lashkar-e-Taiba (LET)

terrorist organization. *U.S. v. Hammoud*, 381 F.3d. 316 (4th Cir. 2004), discussed defendants providing material support to Hizballah. *U.S. v. Sabir*, No. 05-CR-673, Slip Opinion, 2007-WL-1373184 (S.D.N.Y. May 10, 2007), and *U.S. v. Paracha*, No. 03-CR-1197, Unreported, 2006-WL-12768 (S.D.N.Y. January 3, 2006), both addressed membership or support for Al Qaeda. *U.S. v. Damrah*, 334 F.Supp.2d. 967 (N. D. Ohio 2004) involved membership and participation in the Palestinian Islamic Jihad (PIJ) and Islamic Committee for Palestine (ICP). *U.S. v. Aref*, 285 Fed.Appx. 784 (2nd Cir. 2008) is even less applicable. In *Aref*, the defendants were charged with direct participation in an act of terrorism involving the acquisition of surface to air missiles to be launched at American targets on American soil.

      The Government may argue that it is not necessary to connect the defendants to a particular terrorism group. That may be true as far as proving the elements of the offense charged, but the absence of a connection to an identified terrorist group eliminates the need for any explanation of those groups. None of the cases relied on by the Government contain the same evidentiary dynamic as is present here in that none of those cases argues that the subject groups were not known terrorists. No case cited by the Government involves the expert testifying to prove that the individual or group receiving material support was in fact a terrorist or terrorist group at the time as perceived by the defendants. This is particularly true when, at the time reflected in the Indictment, nobody knew that Anwar Al-Awlaki was a terrorist.

      The final element precluding Dr.Meleagrou-Hitchens's proposed testimony is the prejudice inherent in permitting him to ramble at length regarding Islamic terror and terrorist groups when Mr. Mohammad has no connection to any of them. This should be obvious. Evidence Rule 403 permits the Court to exclude evidence, even if it is otherwise admissible, "if

13

its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

The *Amawi* court recognized the obvious unfairness of this sort of jihadist discourse, disconnected from the issues raised in the indictment, the Government seeks from Dr. Meleagrou-Hitchens:

> I also find that, even if his testimony in that regard had some probative value, the risk of very unfair prejudice substantially outweighs any such probative value. Few terms have a greater inherent risk of prejudgment than terrorism, terrorist, jihad, and Al-Quaeda.
>
> *U.S. v. Amawi*, 541 F.Supp.2d. 945, 950 (N. D. Ohio 2008).

> Among other considerations underlying my decision to exclude Kohlmann's testimony, as proposed by the government in light of his lengthy and detailed reports and testimony at a pretrial hearing, was the grave risk of undue and unfair prejudice to the defendants. Much of his testimony related either directly or indirectly to overseas terrorist and insurgent organizations active in the Middle East and elsewhere. The defendants had no connection with any of those groups; to allow testimony about them would invariably suggest to the jury that somehow they did.
>
> *U.S. v. Amawi*, 552 F.Supp.2d. 669, 672.

Here, the Government intends to do the same thing: introduce evidence about terrorist groups and terrorists acts with which the Government admits the defendants have no connection. References to these groups and acts implies acceptance and endorsement of those groups and acts and is offered by the Government as a substitute for substantive proof. A more clear illustration of an attempt to mislead the jury could not be provided. No further illustration of the inherent

14

prejudice should be required.

This is not a compelling case for the Government.  They concede there is no smoking gun in their case.  There is no evidence of any identified plan, plot, preparation, or idea with a terrorist objective.  The Government accuses Mr. Mohammad of conspiring to provide Anwar Al-Awlaki with $22,000.00 in July of 2009, knowing and intending that Anwar Al-Awlaki would use it to kill officers and employees of the United States or U.S. nationals, or use it to commit a act of terrorism transcending national boundaries.  Unpopular ideology is not on trial, nor is Anwar Al-Awlaki.  The evidence is limited to what Mr. Mohammad did and said and knew in 2009 and how that compares to the elements of the offenses with which he is charged.  There is no room for Dr. Meleagrou-Hitchens.

        Respectfully Submitted,

        /s/ David Klucas
        David Klucas
        Attorney for Defendant Ibrahim Mohammad

### Certification

This shall certify that a copy of the forgoing was sent to all counsels of record via the Court's ECF Notification System on this 16th day of January 2018.

        /s/ David Klucas
        David Klucas



U.S. Department of Justice

United States Attorney
Northern District of Ohio

United States Court House
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113-1852

December 1, 2016

Thomas Durkin
Durkin & Roberts
2446 N. Clark Street
Chicago, Illinois 60614

David Lee Klucas
1900 Monroe Street
Toledo, Ohio 43624

Linda Moreno
P.O. Box 10985
Tampa, Florida 33679

Cherrefe A. Kadri
Suite 202
1109 Adams Street
Toledo, Ohio 43624

    RE:    United States v. Yahya Farooq Mohammad, et al.
             Case No. 3:15CR358
             Expert Witness Notice

Dear Counsel:

       Pursuant to Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, you are hereby notified that the government intends to call as an expert witness at trial in the above-referenced case Dr. Alexander Meleagrou-Hitchens. Dr. Meleagrou-Hitchens is currently the Research Director, Program on Extremism, George Washington University. He has a Ph.D. from King's College London, War Studies Department, where his dissertation was a study of Anwar al-Awlaki, "The Spread of the Global Jihad Movement in the West: A Study of Anwar al-Awlaki and His Followers in the Context of Homegrown Radicalization and the Global Jihadist Western Recruitment Strategy." He previously worked as a Lecturer in Terrorism and Radicalization in the War Studies Department at King's College London. His Curriculum Vitae listing his education, qualifications, experience, and publications is attached.

Dr. Meleagrou-Hitchens will testify as an expert on international terrorism, the global jihad movement, with a focus on Awlaki's personal biography, including his time in the United States, United Kingdom and Yemen; his ideology; his published works and remarks; and his role and influence on the movement.

We anticipate that Dr. Meleagrou-Hitchens will testify that Anwar al-Awlaki openly supported violent jihad against the United States and other non-Muslim nations and people who he deemed to be at war with Islam. Further, we anticipate that he will testify that Awlaki's support for violent jihad was manifested no later than 2005, when his translation and interpretation of Constants on the Path of Jihad was published. According to Dr. Meleagrou-Hitchens; analysis, Awlaki's lectures, writings, and blog entries openly advocated violent jihad as the priority of what Awlaki deemed to be all "true Muslims." He is expected to testify that Awlaki's use of the term "jihad" referred exclusively to violent jihad, not to an internal struggle of the individual or a peaceful, non-violent advocacy of the faith.

Dre. Meleagrou-Hitchens is expected to explain the global jihadist movement and Awlaki's unique role within it, particularly as it pertains to Awlaki's appeal to English-speaking Muslims in Western countries. This testimony is expected to include a description of Awlaki's evolution from his time in the United States to becoming an operational terrorist in Yemen. According to Dr. Meleagrou-Hitchens, Awlaki's early works prior to the publication of Constants on the Path of Jihad are consistent with his later, more explicitly pro-violence and pro-jihad writings.

Dr. Meleagrou-Hitchens will also testify to his review of communications of the co-defendants and specific writings by Awlaki shared among the co-defendants. He is expected to testify that the communications of the co-defendants are consistent with Awlaki's ideology of violent jihad. Further, he is expected to testify that based on his review of their communications and the materials produced by Awlaki that they shared, that the co-defendants were aware of Awlaki's support for violent jihad and that they supported Awlaki's goal of violent jihad at the time they conspired to provide and did provide funds to Awlaki. He is also expected to testify that at the time they provided funds to Awlaki, Awlaki had advocated that religious study should not take precedence over the participation in violent jihad.

Dr. Meleagrou-Hitchens is also expected to testify about the meaning of specific writings by Awlaki, including Constants on the Path of Jihad, 44 Ways to Support Jihad, and other works. He is expected to testify that these works refer to violent jihad, and cannot reasonably be interpreted to refer to peaceful, non-violent advocacy.

Dr. Meleagrou-Hitchens' opinions and testimony will be based on his review of the works of Awlaki referred to in the indictment, his review of the communications of the co-defendants referred to in the indictment, and his years-long study of Awlaki and the global jihadist movement in general. His study of Awlaki has included primary materials produced by and about Awlaki, as well as studying the research of other experts who have studied Awlaki and the global jihad movement. His testimony is expected to be consistent with his analysis of Awlaki in "As American as Apple Pie: How Anwar al-Awlaki Became the Face of Western Jihad," a policy report published by the International Centre for the Study of Radicalisation and

2

Political Violence, King's College London, which includes a detailed analysis of Awlaki's history, works, and role in the global jihad movement. This study is attached for your review.

      Please contact me if you wish to discuss this case or Dr. Meleagrou-Hitchens' expected testimony.

                                   Sincerely,

                                   Matthew W. Shepherd
                                   Assistant United States Attorney

Encl.